RECORD NO. 21-3903

In The
# United States Court of Appeals
For The Eighth Circuit

**D. BART ROCKETT,**
**as next friend of his minor children, K.R. and B.R.,**

*Plaintiff – Appellee,*

**v.**

**THE HONORABLE ERIC EIGHMY,**

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI – SPRINGFIELD**
**No. 6:21-cv-03152-MDH, Hon. Douglas Harpool**

**BRIEF FOR THE INSTITUTE FOR JUSTICE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE**

**Victoria Clark**
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 960
Austin, Texas 78701
(512) 480-5936
tclark@ij.org

**Daniel B. Rankin**
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9321
drankin@ij.org

*Counsel for Amicus Curiae Institute for Justice*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* the Institute for Justice does not have a parent corporation, and no publicly held corporation owns any portion of its stock.

/s/ Daniel B. Rankin
Daniel B. Rankin

*Counsel for Amicus Curiae*
*Institute for Justice*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ......................................................................iv

INTEREST OF AMICUS CURIAE .......................................................1

INTRODUCTION ......................................................................................2

ARGUMENT ...............................................................................................5

I. Judicial immunity originates from English common law, but its scope was limited and not easily translatable to the American judicial system. ........................................................................5

A. Judicial immunity arose out of lawsuits against judges, which were the original mechanism for appeal. .........................5

B. Sir Edward Coke introduced an early version of judicial immunity in *Floyd v. Barker*. .....................................................7

C. Post-*Floyd* English cases defined the limits of judicial immunity through jurisdiction, court level, malicious acts, and discretion. ..................................................................9

II. Pre-*Bradley*, American judges did not have uniformly broad immunity protection. ......................................................................13

A. No uniform rule of judicial immunity existed in the early American republic. ...............................................................14

B. Congress abolished judicial immunity in Reconstruction-era legislation. ..................................................................16

III. The Supreme Court mistakenly revived judicial immunity for all judges after Congress abrogated it. ....................................................19

A. The Court mischaracterized judicial immunity as “settled” English doctrine in *Bradley v. Fisher*. ......................................19

B. The Court wrongly concluded judicial immunity survived Section 1983 in *Pierson v. Ray*. ................................................22

IV. Judge Eighmy’s uniquely egregious actions find no protection in either the history of judicial immunity or in its modern reformulation. The doctrine should not be needlessly expanded to cover them. ..........................................................................24

CONCLUSION ...........................................................................................27

CERTIFICATE OF COMPLIANCE ........................................................29

CERTIFICATE OF SERVICE ..............................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bradley v. Fisher*,
80 U.S. (13 Wall.) 335 (1872) ............................................................*passim*

*Brownback v. King*,
141 S. Ct. 740 (2021)..........................................................................1

*Burns v. Reed*,
500 U.S. 478 (1991)..........................................................................25

*Case of the Marshalsea*,
77 Eng. Rep. 1027 (C.P. 1612)..........................................................10

*Egbert v. Boule*,
No. 21-147 (S. Ct. Jan. 26, 2022) .......................................................1

*Ex parte Bradley*,
74 U.S. (7 Wall.) 364 (1868) .............................................................20

*Floyd v. Barker*,
77 Eng. Rep. 1305 (Star Chamber 1608) ...............................7, 8, 9, 21

*Forrester v. White*,
484 U.S. 219 (1988)..........................................................................26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
537 F.3d 667 (D.C. Cir. 2008)............................................................26

*Garza v. Idaho*,
139 S. Ct. 738 (2019)........................................................................26

*Hamilton v. Williams*,
26 Ala. 527 (1855).............................................................................15

*Nat'l Lab. Rels. Bd. v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229*,
974 F.3d 1106 (9th Cir. 2020) .......................................................26

*Peacock v. Bell*,
85 Eng. Rep. 84 (K.B. 1667) .......................................................11

*Pierson v. Ray*,
386 U.S. 547 (1967).......................................................22, 23, 24

*Randall v. Brigham*,
74 U.S. (7 Wall.) 523 (1868) .......................................................*passim*

*Taaffe v. Downes*,
13 Eng. Rep. 15 (C.P. Ir. 1813) .......................................................11

*Taylor v. Nesfield*,
118 Eng. Rep. 1312 (K.B. 1854) .......................................................12

*Terry v. Huntington*,
145 Eng. Rep. 557 (Exch. 1669) .......................................................11

*Wasson v. Mitchell*,
18 Iowa 153 (1864).......................................................15

*Yates v. Lansing*,
5 Johns. 282 (N.Y. 1810).......................................................14

**STATUTES**

18 U.S.C. § 242 .......................................................16

42 U.S.C. § 1983 .......................................................*passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III, § 1 .......... 14

U.S. Const. amend. I .......... 25

U.S. Const. amend. IV .......... 25

U.S. Const. amend. XIII .......... 16

U.S. Const. amend. XIV .......... 16, 25

**RULES**

Fed. R. App. P. 29(a)(2) .......... 1

Fed. R. App. P. 29(a)(4)(E) .......... 1

**OTHER AUTHORITIES**

An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes,
ch. 22, § 1, 17 Stat. 13 (1871) .......... 19

Andrew Johnson,
Veto Message (Mar. 27, 1866), *in* 8 A Compilation of the Messages and Papers of the Presidents 3603–11 (James D. Richardson ed., 1897) .......... 16, 17

Catherine D. Bowen,
*The Lion and the Throne* (1957) .......... 9

Comment,
*Liability of Judicial Officers Under Section 1983*,
79 Yale L.J. 322 (1969) .......... 15, 17, 24

Cong. Globe,
39th Cong., 1st Sess. 1837 (1866) .......... 17

Cong. Globe,
42nd Cong., 1st Sess. 68 (1871) .......... 17

Cong. Globe,
42nd Cong., 1st Sess. 365 (1871) ....................................................................18

Don B. Kates, Jr.,
*Immunity of State Judges Under the Federal Civil Rights Acts:* Pierson v. Ray *Reconsidered*, 65 N.W. L. Rev. 615 (1970)...............................23

Douglas G. Greene,
*The Court of the Marshalsea in Late Tudor and Stuart England*, 20 Am. Hist. J. 267 (1976)..........................................................................10

Institute for Justice,
*50 Shades of Government Immunity* (Jan. 25, 2022), https://ij.org/report/50-shades-of-government-immunity/....................................1

J. Randolph Block,
Stump v. Sparkman *and the History of Judicial Immunity*, 1980 Duke L.J. 878 (1980) ........................................................6, 8, 12

James E. Pfander & Daniel D. Birk,
*Article III and the Scottish Judiciary*, 124 Harv. L. Rev. 1613 (2011) ..............14

Jay M. Feinman & Roy S. Cohen,
*Suing Judges: History and Theory*, 31 S.C. L. Rev. 201 (1980)................*passim*

Patrick Jaicomo & Anya Bidwell,
*Recalibrating Qualified Immunity*, 112 J. Crim. L. & Criminology 105 (2022)..........................................................1

Robert C. Waters,
*Judicial Immunity vs. Due Process: When Should a Judge Be Subject to Suit?*, 7 Cato J. 461 (1987)....................................................................9, 16, 18

Stephen E. Sachs,
*Constitutional Backdrops*, 80 Geo. Wash. L Rev. 1813 (2012)...........................5

## INTEREST OF AMICUS CURIAE[1]

The Institute for Justice (IJ) is a nonprofit, public-interest law firm dedicated to securing greater protection for individual liberty. IJ has become one of the nation's leading advocates on doctrines that obstruct the enforcement of constitutional rights, including governmental immunity. This includes litigating cases (*e.g.*, *Brownback v. King*, 141 S. Ct. 740 (2021)), filing amicus briefs in the Supreme Court and federal circuit courts (*e.g.*, Brief of *Amicus Curiae* Institute for Justice in Support of Respondent, *Egbert v. Boule*, No. 21-147 (S. Ct. Jan. 26, 2022)), publishing scholarship (*e.g.*, Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity*, 112 J. Crim. L. & Criminology 105 (2022)), and conducting nationwide research (*e.g.*, Institute for Justice, *50 Shades of Government Immunity* (Jan. 25, 2022), https://ij.org/report/50-shades-of-government-immunity/).

Like other immunity doctrines, judicial immunity has doubtful historical legitimacy but has nevertheless been expanded to protect government officials who violate the Constitution. When courts apply immunity, they seldom consider whether the doctrine's historical pedigree warrants extension of precedent. IJ seeks to bring

---

[1] No party's counsel authored this brief in whole or in part. No one other than *amicus* Institute for Justice contributed money for this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for the parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

that issue to this Court's attention by providing the relevant history and showing why the doctrine of judicial immunity should not be expanded.

## INTRODUCTION

The uniquely egregious facts of this case raise an important judicial choice: whether the doctrine of judicial immunity should be expanded to protect the extrajudicial jailing and harassment of two innocent children caught in the middle of a custody dispute. This Court should answer no. In its current formulation, judicial immunity is completely unmoored from its modest historical roots. Courts should therefore be reluctant to extend modern judicial-immunity precedent. Such reluctance is warranted even more so when, as here, the extension of precedent would fail to advance constitutional ideals. As the Rocketts have ably shown, the injuries inflicted upon them are unprecedented. The Court should thus decline Judge Eighmy's invitation to build higher on judicial immunity's unstable foundation.

Start with the statute under which the Rocketts bring suit, 42 U.S.C. § 1983. The law, as passed, expressly disavowed immunity doctrines to ensure that state officials would be held accountable for violating the rights of former slaves and those opposed to Reconstruction. State judges were chief among those officials whom the drafters of Section 1983 sought to hold accountable, as the drafters worried that judges would abuse their power to harass and punish their political enemies. Reflecting this concern, the statute's text made unequivocally clear that all state

officials, including judges, could be held accountable for violating constitutional rights.

In addition to statutory text and intent, the common law similarly casts doubt on the legitimacy of judicial immunity. In ostensible support of carrying out the drafters' intent, federal courts have insisted on reading Section 1983 against the backdrop of pre-existing common-law defenses. Staying true to that interpretive commitment, then, requires a serious examination of judicial immunity at common law. In *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1872), the Supreme Court invoked famed legal figure Sir Edward Coke to justify its assertion that judges had historically been absolutely immune from liability at English common law. But the old English doctrine was complex, and the default rule was likely one of liability, not immunity. Thus the modern American rule—with immunity as its default—is the inverse of its English ancestor. Nothing in the historical common-law doctrine of judicial immunity justifies the near-absolute immunity that American judges enjoy today.

This brief traces the dubious doctrine of judicial immunity from its early English roots to its ahistorical rebirth during Reconstruction. A closer look at the doctrine's lineage shows that the English common-law rule—assuming a coherent one even existed—protected only some judges some of the time. And the rule rested largely on justifications that did not make sense in the context of the American court

system. Antebellum American courts thus struggled with how to apply the English rule. But that struggle should have ended, at least in suits against state judges, with the passage of Section 1983. Instead, *Bradley* and its progeny resurrected the doctrine of judicial immunity and injected it with a new virulence that continues to wreak havoc today.

Even so, this Court need not break with existing precedent to affirm the district court here. Judicial immunity has never protected a crusading individual who treats his title as a blunt-force instrument for bending innocent children to his will simply because he disagrees with them. This Court should preserve that status quo and decline Judge Eighmy's invitation to gratuitously enlarge a doctrine with doubtful historical legitimacy.

This brief proceeds in four parts. Part I sets out the English legal history, showing that the historic common-law rule was far narrower than its modern American successor. Part II charts the path of the common law across the Atlantic to the United States, including Congress's abolition of judicial immunity for state-court judges during Reconstruction. Part III then describes how the Supreme Court, misreading both precedent and the congressional record, mistakenly resurrected the doctrine in the twentieth century. Finally, Part IV contends that this Court, although it is bound by opinions adopting the doctrine of judicial immunity, should not build higher on judicial immunity's already shaky historical foundation.

## ARGUMENT

### I. Judicial immunity originates from English common law, but its scope was limited and not easily translatable to the American judicial system.

When the Framers drafted the Constitution, they understood that they were drafting it against "a common law legal system" that would leave many existing English legal rules in place. *See* Stephen E. Sachs, *Constitutional Backdrops*, 80 Geo. Wash. L Rev. 1813, 1818 (2012). This understanding, of course, applied only to those rules that actually existed and were not otherwise ill-suited to the new form of constitutional government. Nevertheless, in *Bradley v. Fisher*, Justice Stephen Field (over a two-justice dissent) mistakenly opined that judicial immunity had "been the settled doctrine of the English courts" and accordingly adopted it as American common law. 80 U.S. (13 Wall.) at 347. In so doing, the Court overinflated the English rule and held that judicial immunity protected all judges nearly all the time. *Id.* That misstep, premised on the Court's view that there was a "settled" English doctrine, untethered the modern American rule from its more nuanced and modest English origins.

#### A. Judicial immunity arose out of lawsuits against judges, which were the original mechanism for appeal.

Judicial immunity was originally believed necessary to remedy a fundamental defect of the medieval legal system: the lack of an appellate process. The right to appeal that litigants enjoy today renders judicial immunity somewhat of an

anachronism. If a judge legally errs, he need not be sued. The error can instead be reviewed and corrected by an appellate court. Nevertheless, judicial immunity—initially created to alleviate collateral lawsuits against judges—continues today, and its applicability now does not always depend on the adequacy of an appeal.

Being a judge in the early English legal system was sometimes a costly undertaking. In the trial-by-combat days, litigants in tenth- and eleventh-century England who were dissatisfied with an adverse legal ruling could contest the ruling only by suing the judge himself. J. Randolph Block, Stump v. Sparkman *and the History of Judicial Immunity*, 1980 Duke L.J. 878, 881 (1980). In these proceedings, litigants complained to a superior lord that the judge had entered a "false judgment," and based on his findings, the lord could annul the judgment and assess a pecuniary penalty against the judge. *Id.*

Over time, the English legal system gradually moved toward a hierarchical system of review, positioning royal courts to review the "false judgments" of local courts. *See id.* at 882–83. Unlike local courts, though, royal courts were "courts of record," meaning that their proceedings were recorded "in Latin on rolls of parchment." *Id.* at 883. This was no small difference. The "process of recording, coupled with royal prerogative, led to the view that the king's record of factual findings . . . was superior to every other record." *Id.* And because the "King's word on events that had taken place in his presence was indisputable," litigants could not

attack the factual record of royal courts. Jay M. Feinman & Roy S. Cohen, *Suing Judges: History and Theory*, 31 S.C. L. Rev. 201, 206 (1980). "[T]hus the source of the record—the judge—could not be subject to civil or criminal liability for an abuse of power." *Id.*

This so-called sanctity-of-the-record doctrine, premised on a judge's proximity to the crown, "had as corollaries the notions that a judge of a court *not* of record had no such protection . . . and that the immunity of a judge of a court of record was limited to acts within in his jurisdiction." *Id.* (emphasis added). Acts of a court-of-record judge outside his jurisdiction were considered acts outside the record—and therefore unprotected. In other words, only a limited group of judges could claim immunity, and that immunity itself was limited. *See id.*

### B. Sir Edward Coke introduced an early version of judicial immunity in *Floyd v. Barker*.

The sanctity-of-the-record doctrine was familiar to a central figure in legal history, Sir Edward Coke, who used it to justify the emerging idea of judicial immunity centuries later. Coke, a champion of the common law, saw King James I and his prerogative courts (like Star Chamber) as a threat to judicial independence, so he used the sanctity of the record as a political tool to aggrandize the status of common-law judges in the now oft-cited case of *Floyd v. Barker*, 77 Eng. Rep. 1305 (Star Chamber 1608). Curiously, neither the sanctity-of-the-record doctrine nor the political pressures of 17th-century England had any American analogues, and yet

the Supreme Court unflinchingly endorsed *Floyd* as a tenet of American common law.

*Floyd* arose from the murder trial of one William Price, over which common-law judge Richard Barker presided. *Id.* at 1306. After Judge Barker sentenced Price to death upon the jury's finding of guilt, questions arose about whether Price in fact committed the murder. *See id.* Those questions later culminated into accusations of conspiracy, and Judge Barker soon found himself before Star Chamber charged with allegedly engaging in a criminal conspiracy during Price's murder trial. *Id.*

In dismissing the charges, Coke, along with "all the court of Star Chamber," explained that because the defendant-judge presided over a court of record, he could not be "drawn into question" "for any thing done by him as Judge." 77 Eng. Rep. at 1305–07. Importantly, however, Coke qualified his ruling based on the distinction between acts within and outside the record: "[T]he Judge . . . cannot be charged for conspiracy, for that which he did openly in Court as Judge," "but if he hath conspired [] out of Court, this is extrajudicial," and it would "amount[] to an unlawful conspiracy." *Id.* at 1306. In Coke's view, then, judicial immunity extended to "the official acts of a judge," Block, *supra*, at 887, but no further. This move was brilliantly tactical. By asserting that Star Chamber (a royal prerogative court) could not hear charges against a common-law judge, "Coke was able to use effectively an

ancient distinction based on the King's position against the King himself." Feinman & Cohen, *supra*, at 208.

Thus, while Coke's ruling was based in the more formalistic consideration of the sanctity of the record, his broader goal of protecting common-law courts was also at play. In this light, some have viewed *Floyd v. Barker* not as a case about judicial immunity per se, but instead about "judicial independence from the executive branch of government"—that is, the Crown. Robert C. Waters, *Judicial Immunity vs. Due Process: When Should a Judge Be Subject to Suit?*, 7 Cato J. 461, 465 (1987). Indeed, *Floyd* can be seen as part of Coke's larger political struggle that led to his attempts at elevating the common law over the King's courts. *See generally* Catherine D. Bowen, *The Lion and the Throne* 342–70 (1957) (narratively describing Coke's various assertions of common-law supremacy over King James's royal prerogative).

### C. Post-*Floyd* English cases defined the limits of judicial immunity through jurisdiction, court level, malicious acts, and discretion.

While *Floyd* was a landmark case, it by no means answered all the questions that would inevitably arise in later cases implicating the new (and narrow) doctrine of judicial immunity. Later opinions indicated that several factors affected judicial liability: jurisdiction and court level, whether the judge acted maliciously, and whether accusations involved judicial acts. These factors, coupled with the nuanced differences of the English judicial system, illustrate that judicial immunity at English

common law was far from a default rule and, in any event, could not have justified the modern, categorical American doctrine.

*Jurisdiction & Court Level*

In the *Case of the Marshalsea*, Coke clarified that a judge was not entitled to judicial immunity when acting outside the court's jurisdiction. 77 Eng. Rep. 1027 (C.P. 1612). There, Coke concluded that the Court of the Marshalsea[2] had improperly exercised jurisdiction over an assumpsit action. *Id.* at 1027. Without jurisdiction, Coke reasoned, the action was "*coram non judice*" (before a person who is not a judge), and the judge could therefore not invoke immunity. *Id.* at 1038. As an illustration of a judge who improperly exercised jurisdiction, Coke suggested that a judge on the Court of Common Pleas (which primarily exercised civil jurisdiction) would not be entitled to judicial immunity if he exercised jurisdiction to hear a plea to the Crown (which we today loosely associate with a felony). *Id.* at 1040.

As the question of jurisdiction increased in importance for immunity purposes, English courts began distinguishing between superior and inferior courts as a proxy for determining whether certain acts were extrajudicial. Applying this

---

[2] The Court of the Marshalsea "handled disputes occurring within the 'verge'—an area twelve miles in all directions from the King's residence." Douglas G. Greene, *The Court of the Marshalsea in Late Tudor and Stuart England*, 20 Am. Hist. J. 267, 267 (1976).

proxy was useful because, unlike superior courts, inferior courts had limited jurisdiction, so their entitlement to immunity was accordingly more limited.

In some cases, "inferior" was broadly conceptualized, encompassing all courts other than the highest courts in England—the "King's courts at Westminster." *See, e.g.*, *Terry v. Huntington*, 145 Eng. Rep. 557, 559 (Exch. 1669); *Taaffe v. Downes*, 13 Eng. Rep. 15 (C.P. Ir. 1813). In other cases, however, the "superior" label was used more generously, attaching it to courts that could issue certain common-law writs to control another court's actions. *See, e.g.*, *Peacock v. Bell*, 85 Eng. Rep. 84 (K.B. 1667) (holding that even a court below the King's court was superior because executions on its judgments could not be stayed by writ of error without security). Whatever the rule, the general confusion among English courts (and, later, American courts) brought further uncertainty as to which judges were entitled to immunity and when. *See* Feinman & Cohen, *supra*, at 217.

*Malicious Acts*

But even assuming a judge had acted within his jurisdiction, a question remained about judicial acts that were nevertheless malicious. Because superior courts had vast jurisdiction and typically answered only to the "'high Court of Parliament' for their conduct," *id.*, superior-court judges were usually immune from suit. But for inferior-court judges, malicious acts—even within their jurisdiction—were actionable. *Id.* at 219. Later English courts thus summarized the historical rule:

"If the act of a magistrate is done without jurisdiction, then it is trespass; [but] if within the jurisdiction, the action rests upon the corruptness of the motive; and, to establish this, the act must be shewn to be malicious." *Taylor v. Nesfield*, 118 Eng. Rep. 1312, 1314 (K.B. 1854).

*Judicial Acts*

As with malicious acts, early English courts also grappled with whether a judge acted sufficiently "judicial" to warrant a grant of immunity. To make that determination, English courts ultimately drew the line at the discretion involved: "A judicial act is one which involves the exercise of discretion, in which something has to be heard or decided." Block, *supra*, at 887 (internal quotation omitted). This distinction between discretionary and non-discretionary acts mapped well onto existing English law, as the type of writ superior courts could issue also depended on the discretion involved: writs of mandamus would issue for corrections of ministerial actions (where there was no discretion), and writs of certiorari and prohibition would issue for corrections of judicial actions (where there was). *Id.* at 888. Judicial immunity was therefore typically only available for actions, such as the issuance of writs of certiorari and prohibition, that involved the exercise of a court's discretion.

* * *

In sum, the English common-law doctrine of judicial immunity was complicated. Many factors—such as jurisdiction, court level, malicious behavior, and discretion—played into a judge's ultimate liability, and the doctrine's complexity has suggested that the default rule was one of liability. Feinman & Cohen, *supra*, at 205. Thus, the English rule looked nothing like the immunity that all American judges enjoy today.

## II. Pre-*Bradley*, American judges did not have uniformly broad immunity protection.

Despite the two countries' shared legal customs, judicial immunity's 18th-century carryover from England to America suffered from translation problems. The early American states varied dramatically in how they applied judicial immunity, if at all, not only because of the doctrine's archaic niceties but also because the American judicial structure differed from the English one in significant ways. Hence colonial America, like England before it, had a complex and varied approach to judicial immunity.

These complexities, however, should have become an afterthought in the postbellum United States. Among the significant legal changes following the Civil War was legislation that brought greater clarity to state government officials' liability for violating individuals' civil rights. And this legislation spoke clearly on the issue of judicial immunity: for state-court judges, it was abolished.

### A. No uniform rule of judicial immunity existed in the early American republic.

Translation problems abounded in judicial immunity's journey across the Atlantic. The first and most obvious issue arose from the fact that the connection between judges and the royal prerogative—and thus to immunity—disappeared because the American system rejected the notion of royal infallibility. Second, and more subtly, the superior–inferior distinction drawn by English courts did not map well onto the American judicial system. *Compare* U.S. Const. art. III, § 1 (vesting Congress with the power to establish "inferior courts"—that is, trial and intermediate appellate courts), *with Yates v. Lansing*, 5 Johns. 282, 290–91 (N.Y. 1810) (analogizing "superior" English courts to American courts of general jurisdiction); *but see* Feinman & Cohen, *supra*, at 229 ("In America, there were no such superior courts, strictly speaking."). Thus, the English rule's protection for superior judges and judges closer to the Crown made little sense in the context of the American system.

In fact, Americans opted instead for a hierarchical, pyramid-like judicial system closer to that of Scotland than to the more horizontal, subject-matter-based structure of England. *See* James E. Pfander & Daniel D. Birk, *Article III and the Scottish Judiciary*, 124 Harv. L. Rev. 1613, 1615–24 (2011). Given the incongruence of the systems, it's no surprise that the early American states varied widely in how they each approached judicial immunity. Indeed, "[t]he English rule

did not win immediate and widespread acceptance in the United States." Comment, *Liability of Judicial Officers Under Section 1983*, 79 Yale L.J. 322, 325 (1969). By the late 18th century, states were severely fractured over the extent to which judges could claim immunity, if at all. *See id.* at 326–27; *compare Hamilton v. Williams*, 26 Ala. 527 (1855) (absolute immunity), *with Wasson v. Mitchell*, 18 Iowa 153 (1864) (malicious acts not protected).

Amidst those fractures—and only four years before its decision in *Bradley v. Fisher*—the U.S. Supreme Court confronted judicial immunity for the first time. In *Randall v. Brigham*, 74 U.S. (7 Wall.) 523 (1868), an attorney sued a state judge for wrongfully removing him from the state bar. In an opinion by Justice Stephen Field (who would pen *Bradley* four years later), the Court attempted, as the English courts did, to distinguish between superior and inferior courts. "[J]udges of limited and inferior authority," the Court said, "are protected only when they act within their jurisdiction," but "no such limitation exists with respect to judges of superior or general authority." *Id.* at 535. Importantly, too, Justice Field cabined the robust rule specifically afforded to superior-court judges by carving out liability for them "when the acts, in excess of jurisdiction, are done maliciously or corruptly." *Id.* at 536.

The *Brigham* Court thus tried, however imperfectly, to engraft the English common-law rules onto the American judicial system. The result was a much more modest doctrine that was at least distantly related to the English rule. But, just as in

England, the reach of judicial immunity in colonial and antebellum America—with differing state and federal positions—remained unclear. Fortunately, however, Congress simplified things greatly when it passed landmark civil-rights legislation after the Civil War.

### B. Congress abolished judicial immunity in Reconstruction-era legislation.

The Civil War Amendments effected a momentous change in American federalism. For the first time, state officials became answerable to the U.S. Constitution. To implement the vision of accountability they had for recalcitrant state officials in the South, the Reconstruction Congresses used their new constitutional power under the Thirteenth and Fourteenth Amendments to pass legislation that abolished the immunity of government officials, including judicial immunity for state judges.

Congress first took aim at judicial immunity in the Civil Rights Act of 1866. Among other things, the 1866 legislation created criminal penalties for state officials who violated citizens' civil rights. 14 Stat. 27 (1866) (now codified at 18 U.S.C. § 242). To that end, the law "unquestionably . . . abolished judicial immunity from criminal prosecution." Waters, *supra*, at 467. In fact, President Andrew Johnson vetoed the bill precisely for that reason, worrying that "[s]tate judges in execution of their judgments could be brought before other tribunals and there subjected to fine and imprisonment . . . ." Andrew Johnson, Presidential Veto Message (Mar. 27,

1866), *in* 8 A Compilation of the Messages and Papers of the Presidents 3603–11 (James D. Richardson ed., 1897). "The legislation thus proposed," Johnson objected, "invades the judicial power of the State." *Id.*

Congress, however, overrode President Johnson's veto. During the vote to override, one congressman responded to Johnson's complaint: "I answer it is better to invade the judicial power of the States than permit it to invade, strike down, and destroy the civil rights of citizens." Cong. Globe, 39th Cong., 1st Sess. 1837 (1866) (remarks of Rep. Lawrence). Another lawmaker attacked the idea of judicial immunity itself, adding that if a judge was "knowingly, viciously, or oppressively, in disregard of a law of the United States, I repeat, he ought to be punished . . . ." *Id.* at 1758 (remarks of Rep. Trumbull). In short, the Congress of 1866 was aware of the doctrine of judicial immunity and expressly repudiated it for criminal prosecution.

The hostility toward judicial immunity was no different just five years later, when Congress passed the Ku Klux Klan Act of 1871, now codified at 42 U.S.C. § 1983. According to the bill's sponsor, "the model for Section 1983 was the second section of the Civil Rights Act of 1866, and 'that section provides a criminal proceeding in identically the same case as this one provides a civil remedy for.'" Comment, *supra*, at 327 (quoting Cong. Globe, 42nd Cong., 1st Sess. 68 (App.) (1871)). In other words, Section 1983 provided a civil remedy to the same extent that the prior 1866 legislation created criminal liability.

The provision of a civil remedy against state judges—with no immunity defense—was unsurprising given the shared view that "local judges in the former Confederate states [were] despots prone to violate the rights of Republicans without regard to law or justice." Waters, *supra*, at 467. The more specific aim of the law, at least for state judges, was to put a stop to "the use of harassing litigation and unjust prosecution in Southern courts meant to silence political opponents or chase them from the state." *Id.*

To that end, multiple lawmakers emphatically stated during debate that the proposed law eliminated judicial immunity for civil-rights violations. One lawmaker, for instance, even said that "[u]nder the provisions of this section, every judge in State court . . . will enter upon and pursue the call of official duty with the sword of Damocles suspended over him."[3] The final language of the bill that would eventually become Section 1983 reflected such sentiments and accordingly had unequivocal terms of liability for state officials, including judges:

> *Any* person who, under color of [state law], subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any

[3] Cong. Globe, 42nd Cong., 1st Sess. 365–66 (App.) (1871) (remarks of Rep. Arthur); *see also id.* at 217 (Sen. Thurman questioning, "What is to be the case of the judge? . . . Is he to be liable in an action? . . . It is the language of this bill; for there is no limitation whatsoever on the terms that are employed"); *id.* at 385 (Rep. Hawley stating that "[b]y the first section, in certain cases, the judge of a State court . . . is made liable to a suit in the Federal Court and subject to damages for his decision against a suitor, however honest and conscientious that decision may be . . .").

> rights, privileges, or immunities secured by the Constitution and laws, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable . . . .

Ku Klux Klan Act of 1871 (emphases added)[4] (codified in revised form at 42 U.S.C. § 1983). The text, along with the intentions behind it, were clear: whatever immunity for state judges existed at common law, it no longer shielded them from civil or criminal liability under federal law.

## III. The Supreme Court mistakenly revived judicial immunity for all judges after Congress abrogated it.

Despite the clarity with which the Reconstruction Congresses spoke, judicial immunity has managed to cling to the fabric of American law. Before the ink dried on Section 1983, the Supreme Court adopted a sweeping view of judicial immunity unmoored from the doctrine's English common-law origins. And in the 1960s and 70s, the Court further cemented the broad reach of the American doctrine, giving rise to the near-absolute immunity that judges enjoy today.

### A. The Court mischaracterized judicial immunity as "settled" English doctrine in *Bradley v. Fisher*.

Again, in *Brigham*, the Supreme Court took a more historically grounded approach to judicial immunity by adopting the English distinction between inferior

[4] An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes, ch. 22, § 1, 17 Stat. 13 (1871).

and superior courts and limiting immunity for malicious or corrupt acts. But just a few years later, the Supreme Court revisited the doctrine in *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1872). Notably, *Bradley* was not a Section 1983 case, even though it was argued a few months after the statute's passage. But given the Supreme Court's ostensible commitment to interpreting Section 1983 in light of preexisting common-law defenses, the Court's understanding of judicial immunity at common law became an important bellwether for the extent to which state judges would be held accountable under the new statute.

*Bradley* arose from the assassination of President Abraham Lincoln. Joseph Bradley was a defense attorney representing a Confederate spy named John Surratt Jr., who was accused of conspiring with John Wilkes Booth to murder President Lincoln. During the trial, Bradley got into a disagreement with the trial judge, George Fisher, and each accused the other of doling out personal insults and chastisement. Judge Fisher later disbarred Bradley, not only from his court but also from the Supreme Court of the District of Columbia. Bradley thereafter sought a writ of mandamus to overturn his disbarment, which he eventually received from the U.S. Supreme Court in *Ex parte Bradley*, 74 U.S. (7 Wall.) 364 (1868).

After receiving mandamus relief, Bradley filed a second lawsuit, this time against Judge Fisher for money damages. Like the first suit, Bradley again made it to the U.S. Supreme Court. Yet he did not meet the same success. The Court, per

Justice Field, held that Judge Fisher could not be held liable for "a judicial act," citing Lord Coke's opinion *Floyd v. Barker* for the proposition that "motives with which [a] judicial act [is] performed" do not affect liability. 80 U.S. at 347–48. In an about-face from *Brigham*,[5] Justice Field wrote that "the settled doctrine of the English courts" was that judicial immunity protected all judges, inferior and superior, to the same extent and that maliciousness had no relevance to liability. *See id.* at 347.

As shown above in sections I and II, however, a careful examination of judicial immunity's English origins and development demonstrates that the Court misstated the rule. Before *Bradley*, judicial immunity had never protected all judges, at nearly all times, for even the most malicious actions. Under Coke's view, for instance, the judge in *Bradley* would not have been entitled to immunity if he was the judge of an inferior court and his actions were malicious, even though he was arguably performing a judicial function. *See* section I.C., *supra*. Coke likely would have seen *Bradley*'s rule of judicial immunity as overinflated, ignoring not only the important limitations English common law had placed on immunity, *see* section I.C.,

[5] Some scholars explain Justice Field's change of heart from *Brigham* to *Bradley* as characteristically "Fieldian," whereby his "judicial posture became more extreme in the later portion of his tenure on the Supreme Court." Feinman & Cohen, *supra*, at 248. Unlike his opinion in *Bradley*, Field's opinion in *Brigham* was "more temperate, his reliance on precedent greater, and his concern for the consequences of liability less." *Id.*

*supra*, but also the poor fit the English rule had on a differently structured American court system, *see* section II.A., *supra*. In short, *Bradley*'s historical analysis simply does not hold up.

Further, even if *Bradley* had correctly characterized the English rule, the Court should not have adopted it wholesale. Coke justified judicial immunity by pointing to a court's proximity to the Crown (*i.e.*, the sanctity of the record), which could legally do no wrong in pre-Enlightenment England. In that context, judicial immunity for judges who were exercising royal power was, at the very least, internally consistent. And yet, while the American legal system fundamentally rejected the notion of kingly power and its attendant lack of accountability, *Bradley* did not so much as gesture at this difference, opting instead to grant judges broad and unprecedented immunity that they had never before enjoyed even when they wielded the power of the British Empire's infallible sovereign. The *Bradley* Court's reasoning, then, was both based on a mischaracterization of the history itself and inconsistent with basic tenets of American self-government.

### B. The Court wrongly concluded judicial immunity survived Section 1983 in *Pierson v. Ray*.

*Bradley*'s missteps did not deter the Supreme Court from building even higher on judicial immunity's shaky historical foundation. Almost a century later, in *Pierson v. Ray*, 386 U.S. 547 (1967), the Court directly considered whether a state judge could assert an immunity defense in a Section 1983 suit. It answered that

question in the affirmative and wrongly doubled down on its near-absolutist approach.

In *Pierson*, the defendant-judge gave the plaintiffs maximum sentences under a breach-of-the peace statute for attempting to integrate a bus terminal. *Id.* at 548–50. After their convictions were overturned, the plaintiffs sued the judge under Section 1983. Their suit, however, was not predicated on a mere legal error. Because their convictions were "unquestionably contrary" to a recent decision, the plaintiffs' "situation presented an unusually sympathetic case for judicial liability—the conviction was so clearly unfounded as to raise a virtually conclusive presumption of racial prejudice." Don B. Kates, Jr., *Immunity of State Judges Under the Federal Civil Rights Acts:* Pierson v. Ray *Reconsidered*, 65 N.W. L. Rev. 615, 617 (1970).

Despite the questionable circumstances under which the plaintiffs were convicted, the Supreme Court rebuffed their claims, relying on the "solidly established" doctrine of judicial immunity that *Bradley* spoke into existence. *Pierson*, 386 U.S. at 553–54. The Court also quickly dismissed the notion that Section 1983 abolished or otherwise altered the doctrine of judicial immunity, concluding that "[t]he legislative record g[ave] no clear indication" on the matter. *Id.* at 554. It thus affirmed the dismissal of the plaintiffs' claim against the judge.

In a vigorous dissent, Justice Douglas rightly pointed out that both the text and legislative history compelled the opposite conclusion. The majority, Justice

Douglas explained, "ignore[d] the fact that every member of Congress who spoke to the issue [of judicial immunity] assumed that the words of the statute meant what they said and that judges would be liable." *Id.* at 561 (Douglas, J., dissenting). And besides, if the *Pierson* majority was truly concerned with Congress's intent regarding the common law at the time Section 1983 was passed, "a legislative inquiry into the subject would have disclosed *Randall v. Brigham*"—with its more cabined view of judicial immunity—"as the leading Supreme Court case," as well as the thoroughly mixed approaches of state courts. *See* Comment, *supra*, at 325–28. According to Justice Douglas, then, judicial immunity should not have survived the passage of Section 1983, and the *Pierson* majority was wrong to conclude otherwise.

## IV. Judge Eighmy's uniquely egregious actions find no protection in either the history of judicial immunity or in its modern reformulation. The doctrine should not be needlessly expanded to cover them.

As the Rocketts alleged in their complaint below, Judge Eighmy took unprecedented actions against two innocent, non-party children. The district court, in turn, rightly concluded that the Rocketts plausibly pleaded a right to relief based on their unique allegations. That is because Judge Eighmy's "unorthodox" (to put it charitably) method of jailing children (Appellant Br. at 18) has never found shelter in judicial-immunity doctrine—historical or otherwise.

Start with the limits originally drawn at common law. The fundamental theory undergirding the early common-law rule—connection to the Crown—has vanished, along with it any plausible theoretical basis for judicial immunity more generally. But even assuming royal perks had any relevance to American law, English common law would still look unfavorably upon Judge Eighmy—an inferior-court judge whose nonjudicial actions can only be explained by maliciousness. *See* section I.C., *supra*. Under the Supreme Court's decision in *Brigham*, too, in which the Court more valiantly tried to adopt the English common law, Judge Eighmy's actions would not have been condoned for the same reasons. *See Brigham*, 74 U.S. (7 Wall.) at 535. More pointedly, though, as a state-court judge who deprived children of their constitutional rights under the First, Fourth, and Fourteenth Amendments, Judge Eighmy would have been unquestionably liable under Section 1983 as originally and correctly understood.

This Court, however, need not reach back in time to affirm the district court's denial of immunity. It need only recognize the limits of judicial immunity—colored by its historical illegitimacy—to conclude that the modern doctrine should not be expanded and contorted to cover Judge Eighmy's actions. As the Supreme Court acknowledges, it has been "quite sparing in [its] recognition of absolute immunity and ha[s] refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (internal quotations and citations omitted). So

when there is "little available evidence suggest[ing] that" certain precedents are "correct as an original matter, the Court should tread carefully before extending [them]." *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting). Circuit-court judges have accordingly taken care to "resolve questions about the scope of [] precedents in light of and in the direction of the constitutional text and constitutional history." *Free Enter. Fund v. Pub. Co. & Acct. Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). That's particularly true when, as here, "a faithful reading of precedent shows it is not directly controlling." *Nat'l Lab. Rels. Bd. v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1117 (9th Cir. 2020) (Bumatay, J., dissenting).

Cases implicating judicial immunity are often fact intensive, and the line separating judicial from nonjudicial acts has "not [been] perfectly well-defined." *Forrester v. White*, 484 U.S. 219, 225 (1988). Hence the Supreme Court's instruction that courts apply a "functional approach" to the question, leaving lower courts plenty of precedential breathing space to consider the facts of each case. The district court below followed that instruction, cabining its analysis to the "unique" facts of this case—for example, the fact that "there were no judicial proceedings pending that would allow" for the "judicial sanction[s]" Judge Eighmy imposed. In other words, Judge Eighmy's actions were singularly disturbing—judges rarely, if ever, throw off

all legal restraints on their power to jail children with whom they disagree—and the district court rightly concluded that judicial immunity did not protect Judge Eighmy under these specific circumstances.

This Court can follow the same path here. Judge Eighmy's actions are uniquely appalling. For that reason, Judge Eighmy can prevail only if this Court accepts his invitation to set new precedent that extends beyond what can be reasonably extrapolated from the caselaw. As explained above, the history of judicial immunity casts serious doubt on its doctrinal legitimacy. And only by warping the common law further can Judge Eighmy find shelter in it. The Court should decline Judge Eighmy's invitation to do so.

## CONCLUSION

In its early English days, judicial immunity evolved from a fiction associated with parchment rolls into a limited tool of political preservation wielded by a champion of the common law. And then came the doctrine's Americanization, beset by judicial misapplication and exhumed despite congressional abrogation. While modern judicial immunity is more potent than history suggest it should be, it still has limits. Those limits are set by precedent, and that precedent need not be extended for this set of unique allegations. Holding otherwise would distort the doctrine and mark another notable departure from judicial immunity's historical legitimacy. This Court should accordingly affirm the decision of the district court.

Date: April 18, 2022

Respectfully Submitted,

/s/ Daniel B. Rankin
Daniel B. Rankin
INSTITUTE FOR JUSTICE
901 N. Glebe Rd. Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
Email: drankin@ij.org

Victoria Clark
INSTITUTE FOR JUSTICE
816 Congress Ave. Suite 960
Austin, Texas 78701
Phone: (512) 480-5936
Fax: (512) 480-5937
Email: tclark@ij.org

*Counsel for Amicus Curiae Institute for Justice*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains 6,467 words.

   [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14pt Times New Roman.

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

3. This document has been scanned for viruses and is virus-free.

Date: April 18, 2022

/s/ Daniel B. Rankin
Daniel B. Rankin

## CERTIFICATE OF SERVICE

I hereby certify that this 18th day of April, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to any CM/ECF participants.

/s/ Daniel B. Rankin
Daniel B. Rankin

*Counsel for Amicus Curiae*
*Institute for Justice*