No. 21-3903

---

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

D. BART ROCKETT,
as next friend of his minor children K.R. and B.R.,
*Plaintiff-Appellee*,

v.

THE HONORABLE ERIC EIGHMY,
*Defendant-Appellant*.

---

Interlocutory Appeal from the United States District Court
for the Western District of Missouri
The Honorable Douglas Harpool

---

# BRIEF OF AMICUS CURIAE NATIONAL ASSOCIATION OF COUNSEL FOR CHILDREN IN SUPPORT OF PLAINTIFF-APPELLEE (SEEKING AFFIRMANCE)

---


J. Bennett Clark
Emma G. McEnery
Ellen M. Komlos
BRYAN CAVE LEIGHTON
PAISNER LLP
211 N. Broadway, Ste. 3600
St. Louis, Missouri 63102
Tel.: (314) 259-2000
Ben.Clark@bclplaw.com
Emma.McEnery@bclplaw.com
Ellen.Komlos@bclplaw.com

Kristin Howard Corradini
BRYAN CAVE LEIGHTON
PAISNER LLP
161 North Clark Street, Ste. 4300
Chicago, Illinois 60601
Tel.: (312) 602-5000
Kristin.Corradini@bclplaw.com

*Counsel for Amicus Curiae National Association of Counsel for Children*

# TABLE OF CONTENTS


STATEMENT OF CONSENT ........................................................................1

INTEREST OF AMICUS CURIAE ..............................................................1

FRAP RULE 29(a)(4)(E) STATEMENT ......................................................2

INTRODUCTION ....................................................................................2

ARGUMENT ...........................................................................................4

A. Appellant's Actions Here Implicate Due Process and the Right of Youth to Be Heard On Fundamental Decisions Affecting Their Upbringing and Well-Being ..........4

1. Historical Development of Children's Rights ....................................6

2. Children's Established Right to Be Heard..........................................7

a. The Child's International Right to be Heard ..............................8

b. The Child's Right to be Heard Under State Law........................9

c. Harms of Denying the Child's Right to be Heard ....................10

B. Judge Eighmy's Actions Were Contrary to the Baseline Expectations of Family Law Judging..........................................................................11

1. Facilitation Is A Well-Founded Goal of Family Court ....................12

2. Impact of Perception of Judicial Unfairness.....................................14

C. The Record Reflects an Inappropriate Threat of Referral to Foster Care and Two Instances of Deleterious Incarceration ....................................................16

1. Potential Negative Impacts of Juvenile Detention and Incarceration ..........17

2. Potential Negative Impacts of Foster Care .......................................19

3. The Crossover Phenomenon ...........................................................21

D. The Treatment of B.R. and K.R. Here Triggers Concern About the Disproportionate and Disparate Treatment of Other Youth..............................22

1. Racial Disparity: The Equity Perspective........................................23

CONCLUSION .........................................................................................24

CERTIFICATE OF COMPLIANCE ……………………………………………. 26

CERTIFICATE OF SERVICE ………………………………………………….. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Gault*,
387 U.S. 1 (1967)....................7, 20

*J.B. v. Washington County*,
127 F.3d 919 (10th Cir. 1997)....................20

*Jordan ex rel. Jordan v. Jackson*,
15 F.3d 333 (4th Cir. 1994)....................20

*Stanley v. Illinois*,
405 U.S. 645 (1972)....................20

**Statutes**

MO. REV. STAT § 211.061....................19

MO. REV. STAT. § 211.211....................20

MO. REV. STAT. § 452.375....................7

MO. REV. STAT. § 452.375(2)(8)....................5

MO. REV. STAT. § 452.423....................20

**Rules**

FRAP 29(a)(2)....................1

FRAP 29(a)(4)(E)....................2

**Other Authorities**

*1 in 4 States Don't Require Judge to Consider Child's Custody Preference*, CUSTODY XCHANGE (Nov. 17, 2020), https://www.custodyxchange.com/topics/research/custody-preferences-children.php....................7

*A Right to Liberty: Resources for Challenging the Detention of Children*, NAT'L JUVENILE DEF. CLINIC (August 2019), https://njdc.info/wp-content/uploads/2019/A-Right-to-Liberty-Resources-for-Challenging-the-Detention-of-Children-1.pdf....................18

Barbara A. Babb, *Guest Editorial Notes*, 40 FAM. CT. REV. 413 (2002), https://www.afccnet.org/Portals/0/PDF/the_modern_family_court_jud ge.pdf?ver=q4udjLCww9UGILyXlPiNWg%3d%....................12

Barry Holman & Jason Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities*, JUST. POL'Y INST., https://justicepolicy.org/wp-content/uploads/2022/02/06-11_rep_dangersofdetention_jj.pdf (last visited Mar. 28, 2022)....................18

Carol A. Schubert et al., *Influence of Mental Health and Substance Use Problems and Criminogenic Risk on Outcomes in Serious Juvenile Offenders*, 50 J. OF THE AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY 925 (2011)....................15

Dana Kennedy, *'AGT' Kid Magicians The Rocketts Strip Searched Before Jail Time, Neighbor Says*, THE NEW YORK POST (Nov. 28, 2020), https://nypost.com/2020/11/28/atg-kid-magicians-the-rocketts-strip-searched-before-jail-neighbor/....................5

Donna M. Bishop, Charles E. Frazier, Lonn Lanza-Kaduce & Lawrence Winner, *The Transfer of Juveniles to Criminal Court: Does it Make a Difference?*, 42 CRIME & DELINQ. 171 (1996)....................16

Eli Hager, *Many Juvenile Jails Are Now Almost Entirely Filled with Young People of Color*, THE MARSHALL PROJECT (Mar. 8, 2021, 6:00 AM), https://www.themarshallproject.org/2021/03/08/many-juvenile-jails-are-now-almost-entirely-filled-with-young-people-of-color ....................23

Elizabeth S. Barnert et al., *Does Incarcerating Young People Affect Their Adult Health Outcomes?*, 139 PEDIATRICS 1 (2017)....................18, 23

*Every Kid Needs a Family: Crossover Youth and Institutional Care*, NCSC, https://www.ncsc.org/everykid/_media/microsites/files/every-kid/EKNF_Crossov ....................21

*Family Justice Initiative: Principles for Family Justice Reform*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (2019), https://iaals.du.edu/sites/default/f family_justice_initiative_principles.pdf. ....................11, 13

*High Quality Legal Representation for All Parties in Child Welfare Proceeding*s, U.S. DEP'T OF HEALTH & HUM. SERVS. (Log No: ACYF-CB-IM-17-02 Jan. 17, 2017), https://www.acf.hhs.gov/sites/default/files/documents/cb/im1702.p df ....................6

Howard A. Davidson, *The Child's Right to be Heard and Represented in Judicial Proceedings*, 18 PEPP. L. REV. 255 (1991) ....................11

IAALS, CORNERSTONES OF STATE JUDICIAL SELECTION: LAYING THE FOUNDATION FOR QUALITY COURT SYSTEMS AND JUDGES (2012), available at http://iaals.du.edu/initiatives/quality-judges-initiative/recommendedmodels/corners....................13, 14, 15

Jacqueline Clarke, *Do I Have a Voice? An Empirical Analysis of Children's Voices in Michigan Custody Litigation*, 47 FAM. L.Q. 457 (2013) ....................8

Janice M. Rosa, *Book Review: Leonard Edwards'* The Role of The Juvenile Court Judge: Practice and Ethics, 52 FAM. CT. REV. 704 (2014) (reviewing LEONARD EDWARDS, CAL. JUDGES ASS'N, THE ROLE OF THE JUVENILE COURT JUDGE: PRACTICE AND ETHICS (2012))....................12

Josh Gupta-Kagan, *Due Process of Law and Child Protection*, *in* CHILD WELFARE LAW AND PRACTICE: REPRESENTING CHILDREN, PARENTS, AND STATE AGENCIES IN ABUSE, NEGLECT, AND DEPENDENCY CASES 387 (Donald N. Duquette et al. eds., 3 ed. 2016) ....................21

Justine Kaneda, *The Impact of Juvenile Incarceration on Youth Mental Health: A Systemic Failure of Mass Incarceration in the United States*, STAN. MED., https://med.stanford.edu/schoolhealtheval/socialPrograms.html (last visited April 11, 2022) ....................18

Katherine Merger Kelsey, *A Child's Right to Counsel: The Case for Indiana to Craft Its Own Framework*, 9 IND. J.L. & SOC. EQUALITY 167 (2021) ....................20

Kevin Burke & Steve Leben, *Procedural Fairness: A Key Ingredient in Public Satisfaction*, 44 CT. REV. 4 (2007) ....................14

*Kids Deserve Better: Why Juvenile Detention Reform Matters*, ANNIE E. CASEY FOUND. (2018), https://www.aecf.org/blog/kids-deserve-better-why-juvenile-detention-reform-matters ....................19, 24

Kim Dvorchak, *Closing the Justice Gap for Youth in the Foster Care to Prison Pipeline*, CIVIC RSCH. INST.: JUVENILE JUST. UPDATE (2022) ....................19, 21, 22

Larry Wright, Comment, *Interviewing Children in Child Custody Cases*, , 18 J. OF THE AM. ACAD. OF MATRIMONIAL LAWS. 295 (2002) ....................9

Linda D. Elrod, *Counsel for the Child in Custody Disputes: The Time is Now*, 26 FAM. L.Q. 53 (1992) ....................10

Linda D. Elrod & Milfred D. Dale, *Paradigm Shifts and Pendulum Swings in Child Custody: The Interests of Children in the* Balance, 42 FAM. L.Q. 381 (2008) ....................8

Marvin Ventrell, *The History of Child Welfare Law*, *in* CHILD WELFARE LAW AND PRACTICE: REPRESENTING CHILDREN, PARENTS, AND STATE AGENCIES IN ABUSE, NEGLECT, AND DEPENDENCY CASES 189 (Donald N. Duquette et al. eds., 3d ed. 2016) ........................................................................................6, 7

Meghan R. Ogle & Jillian J. Turanovic, *Is Getting Tough with Low-Risk Kids a Good Idea? The Effect of Failure to Appear Detention Stays on Juvenile Recidivism*, CRIM. JUST. POL'Y REV. (2016).............15, 16, 17

Natalie Anne Knowlton, *The Modern Family Court Judge: Knowledge, Qualities & Skills for Success*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. (2014) ..............................12, 13, 14, 22

*Neglect and Abuse Proceedings*, NAT'L ASS'N OF COUNSEL FOR CHILDREN (2022), https://nacchildlaw.app.box.com/s/vsg6w5g2i8je6jrut3ae0zjt2fvgltsn ...........................................................................................................5

Pamela Laufer-Ukeles, *The Relational Rights of Children*, 48 CONN. L. REV. 741 (2016)..........................................................................8, 23

Peter J. Ashkar & Dianna T. Kenny, *Views from the Inside: Young Offenders' Subjective Experiences of Incarceration*, 52 INT'L J. OF OFFENDER THERAPY & COMPAR. CRIMINOLOGY 587 (2008.........................16, 18

Rebecca Hinton, Comment, *Giving Children a Right to be Heard: Suggested Reforms to Provide Louisiana Children a Voice in Child Custody Disputes*, 65 LA. L. REV. 1539 (2005).....................................10, 11, 13

Riya Saha Ahah & Jessica Feierman, *Strip-Searching Children Is State-Imposed Trauma*, 47 AM. BAR ASS'N (2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/empowering-youth-at-risk/strip-searching-children-is-state-imposed-trauma/ ...........................................................5

Shanta Trivedi, *My Family Belongs to Me: A Child's Constitutional Right to Family Integrity*, 56 HARV. C.R.-C.L. L. REV. 267 (2021)...........6, 8, 20

Tom R. Tyler, *Procedural Justice and the Courts*, 44 CT. REV. 26 (2007)............................................................................................14, 15

## STATEMENT OF CONSENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Amicus National Association of Counsel for Children ("NACC") has received consent for this filing from counsel for the parties.

## INTEREST OF AMICUS CURIAE

Founded in 1977, NACC is a 501(c)(3) non-profit child advocacy and professional membership association dedicated to advancing the rights, well-being, and opportunities of youth impacted by the child welfare system through access to high-quality legal representation. A multidisciplinary organization, its members primarily include child welfare attorneys and judges, as well as professionals from the fields of medicine, social work, mental health, and education. NACC's work includes federal- and state-level policy advocacy, the national Child Welfare Law Specialist attorney certification program, a robust training and technical assistance arm, and an *amicus curiae* program. Through the *amicus curiae* program, NACC has filed numerous briefs promoting the legal interests of children in state and federal appellate courts, as well as the Supreme Court of the United States. More information about NACC can be found at www.nacchildlaw.org.

The matters advanced in this brief are relevant to whether the facts as pleaded, which are assumed to be true at this stage of the proceedings, show that the Appellant acted outside his judicial role in engaging in the various acts alleged

by Mr. Rockett. Countenancing the subject activity would normalize the harms discussed in this brief. NACC supports affirmance of the district court's decision below.

Authority to file this brief was given by the NACC Board of Directors, which is authorized to act on the NACC's behalf and empowered to grant such authority.

## FRAP RULE 29(a)(4)(E) STATEMENT

No party's counsel authored the proposed brief, in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of the brief. No person, other than NACC or its counsel, contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

This case involves an unusual, and troubling, factual scenario.[1] In response to expressing to the Appellant (Taney County, Missouri Associate Circuit Judge Eric Eighmy), in an informal setting, that they did not wish to leave with their mother following a custody modification hearing and settlement, two children (denominated "B.R." and "K.R.") were taken by Appellant to adult detention cells in a Taney County jail. App. 20; R. Doc. 1, at 14. There, they were forced to remove certain items of clothing, and were locked in separate, individual cells. *Id.*

---

[1] NACC adopts Appellee's Statement of the Case.

After approximately an hour unlawfully confined in unpleasant conditions, Judge Eighmy returned, threatening to "take [them] away from [their] parents and send [them] to live in the Missouri foster care system." App. 21; R. Doc. 1, at 15. After returning to the courthouse lobby, Appellant spoke aggressively to B.R. and K.R. until, against their wishes, they acquiesced to go and live with their mother in Utah. *Id.*

None of these events occurred as part of a judicial proceeding, which had concluded for the day. Instead, Appellant approached the children on his own volition outside the courtroom. The Guardian *Ad Litem* was not present. The children were not provided notice of Appellant's intent to initiate an informal discussion regarding their custody arrangement and were effectively denied the opportunity to be heard. Neither parent's assent for the seizure was obtained. Appellant made no judicial record of findings related to the seizure. App. 22; R. Doc. 1, at 16. In addition to the lack of notice and opportunity to be heard, the children were not afforded other basic due process in connection with their jailing, such as the opportunity to know opposing evidence, to cross-examine witnesses, or to be represented by legal counsel.

Some months later, Judge Eighmy *sua sponte* issued a "Pick Up Order" for the two children, who were present on the family farm in Louisiana to quarantine from the COVID-19 virus. App. 27; R. Doc. 1, at 21; App. 42; R. Doc. 1-2. In

November 2020, deputies of the Union Parish, Louisiana Sheriff's Department handcuffed B.R. and K.R. after the children stated they would not go with their mother. App. 28; R. Doc. 1, at 22. The children were driven to a juvenile detention center, strip-searched and incarcerated for two days, in separate cells. App. 30; R. Doc. 1, at 24. Their father's attempt to visit was denied. *Id.* The local Prosecuting Attorney charged the children criminally with being "ungovernable." *Id*. Those charges were later dropped. App. 30-31; R. Doc. 1, at 24-25.

In this brief, NACC addresses the following points relating to areas of its particular interest: (1) due process, and the right of youth to be heard; (2) the proper role of family court judges; (3) the deleterious consequences of youth incarceration and foster care, including the crossover phenomenon; and (4) racial disparity: the equity perspective.

## ARGUMENT

### A. Appellant's Actions Here Implicate Due Process and the Right of Youth to Be Heard On Fundamental Decisions Affecting Their Upbringing and Well-Being

The present case illustrates the importance of children's due process rights, especially the right to be heard in a formal setting with respect to decisions as to where they live, their family relationships, and other basic determinations concerning their upbringing and well-being. There can be no serious question that in the present case the respective ages of the children (15 and 13 at the time of

filing the Complaint) rendered them capable of giving informed insights and stating preferences[2] that could and should have been considered by the judge in the initial custody determination.[3]

Instead, the children—who were not present for the hearing and settlement discussion—were approached informally by Judge Eighmy, to whom they expressed their custody preferences, and for which they were intimidated and placed in an adult penal institution. Upon continuing to express that preference months later, they were strip-searched and jailed for two days. This treatment creates searing, traumatic memories and a distrust of the judicial system.[4]

---

[2] Children and youth of all ages, including infants and pre-verbal children, should be entitled to due process. *Recommendations for Legal Representation of Children and Youth in Neglect and Abuse Proceedings*, NAT'L ASS'N OF COUNSEL FOR CHILDREN 7 (2022), https://naccchildlaw.app.box.com/s/vsg6w5g2i8je6jrut3ae0zjt2fvgltsn.

[3] MO. REV. STAT. § 452.375(2)(8) (2021).

[4] Riya Saha Ahah & Jessica Feierman, *Strip-Searching Children Is State-Imposed Trauma*, 47 AM. BAR ASS'N (2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/empowering-youth-at-risk/strip-searching-children-is-state-imposed-trauma/; Dana Kennedy, *'AGT' Kid Magicians The Rocketts Strip Searched Before Jail Time, Neighbor Says*, THE NEW YORK POST (Nov. 28, 2020), https://nypost.com/2020/11/28/atg-kid-magicians-the-rocketts-strip-searched-before-jail-neighbor/.

### 1. *Historical Development of Children's Rights*

Children's rights have gradually expanded over time, especially since the abolition of slavery.[5] For a significant portion of the 20th Century, children were viewed simply as property of their parents, with an emphasis on fathers' rights.[6]

As the American juvenile court history evolved, some commentators opined that there has existed a tension between, on the one hand, outcome-motivated problem solving and, on the other, adherence to constitutional due process.[7] As the field has evolved, there has been increasing recognition—including by the federal government—that these goals are complementary and should both be prioritized.[8] Access to procedural justice for all parties helps achieve problem-solving, solution-based court proceedings.[9] "[C]hildren have become something they were not in the nineteenth and much of the twentieth centuries—persons under the law who may demand certain things, including due process of law."[10] "Children's status can be

---

[5] Shanta Trivedi, *My Family Belongs to Me: A Child's Constitutional Right to Family Integrity*, 56 HARV. C.R.-C.L. L. REV. 267, 268 (2021).
[6] *Id.*
[7] *Id.* at 191.
[8] *High Quality Legal Representation for All Parties in Child Welfare Proceeding*s, U.S. DEP'T OF HEALTH & HUM. SERVS. 5-6 (Log No: ACYF-CB-IM-17-02 Jan. 17, 2017), https://www.acf.hhs.gov/sites/default/files/documents/cb/im1702.pdf.
[9] *Id.*
[10] Marvin Ventrell, *The History of Child Welfare Law*, *in* CHILD WELFARE LAW AND PRACTICE: REPRESENTING CHILDREN, PARENTS, AND STATE AGENCIES IN ABUSE, NEGLECT, AND DEPENDENCY CASES 189, 193 (Donald N. Duquette et al. eds., 3d ed. 2016).

viewed as a movement from children as property, to children as welfare recipients, to children as rights-based citizens."[11]

In Missouri, as in the majority of states, courts may, but are not required to, entertain the wishes of children in decisions impacting their lives.[12] And Missouri does not set an age that is presumptive of the ability of the child to do so.[13]

In *In re Gault*, 387 U.S. 1 (1967), the U.S. Supreme Court found a right of due process with respect to juvenile delinquency adjudications, including notice of charges; confrontation and cross-examination of witnesses; a prohibition against self-incrimination; and the right to counsel.[14] While *Gault* explicitly did not extend to the family court context, *Gault* protections nonetheless should have been triggered once B.R. and K.R were at risk of being jailed. Instead, the children here were detained despite an absence of due process.

### 2. *Children's Established Right to Be Heard*

> Ultimately, children's rights cannot be completely subsumed to parental rights—children have needs that may conflict with parental needs and these rights should be taken seriously. Further,

---

[11] *Id.*

[12] Mo. Rev. Stat. § 452.375; *1 in 4 States Don't Require Judge to Consider Child's Custody Preference*, Custody Xchange (Nov. 17, 2020), https://www.custodyxchange.com/topics/resear ch/custody-preferences-children.php.

[13] *Id.*

[14] "The *Gault* decision exposed the myth of child saving and the inherent abuses of a system without due process, which ignores the rights of the individual in favor of the proclaimed 'good of the individual.'" Ventrell, *supra* note 10, at 192.

> children's rights cannot be subsumed to state control either, as it is usually parents who need to provide care. Although children cannot be entirely relied upon to effectuate their own needs, since they are caught between agency and dependency, the stronger voices they develop as they mature and the transitional nature of childhood must be taken into account."[15]

### a. *The Child's International Right to be Heard*

A child's right to be heard in proceedings affecting his or her interests has been widely accepted and established on the international level. Article 12 of the United Nations Convention on the Rights of the Child ("CRC"), for example, gives children the right to express views freely and to participate in any legal proceeding that affects them.[16] Article 9 of the CRC provides that children should not be separated from parents against their will, and prioritizes the child's right to family integrity.[17] The United States is the only country in the world that has not ratified

---

[15] Pamela Laufer-Ukeles, *The Relational Rights of Children*, 48 CONN. L. REV. 741, 748 (2016) (footnote omitted); *see also* Jacqueline Clarke, *Do I Have a Voice? An Empirical Analysis of Children's Voices in Michigan Custody Litigation*, 47 FAM. L.Q. 457, 470 (2013) ("[C]ourts at a minimum should consider the child's views if the child is capable of making views known and wants to make them known.").

[16] Linda D. Elrod & Milfred D. Dale, *Paradigm Shifts and Pendulum Swings in Child Custody: The Interests of Children in the* Balance, 42 FAM. L.Q. 381, 405 (2008) (citing The United Nations Convention on the Rights of the Child art. 12, Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448).

[17] Trivedi, *supra* note 5, at 276.

the CRC.[18] However, the U.S. has signed the treaty, "which creates an obligation to avoid actions that would defeat the larger goals of the Convention."[19]

### b. *The Child's Right to be Heard Under State Law*

The Uniform Marriage and Divorce Act ("UMDA") was adopted by the National Conference of Commissioners on Uniform State Laws in 1970, providing, as one of the factors to be considered by a judge in assessing "best interests," "the desires of the child."[20] While children are not always considered "parties" to a custody action, their voices should nonetheless be heard, considered, and given appropriate weight by the trier of fact.[21]

Statutes in many states mandate judges to consider the child's preference in custody cases, as one of the factors to guide decision-making.[22] In the dissolution custody context, judges can accomplish this in a trauma-informed manner by moving "***carefully*** when considering, requesting and conducting interviews of children in chambers by the presiding judge"[23]—and such logic applies to all contested custody cases, regardless of whether there is a dissolution. Judges should

---

[18] *Id.* at 284.
[19] *Id.*
[20] Elrod & Dale, *supra* note 16, at 393 (citing UNIF. MARRIAGE AND DIVORCE ACT § 402, 9A U.L.A. 288 (1979)).
[21] *Id.* at 403, 405.
[22] Larry Wright, Comment, *Interviewing Children in Child Custody Cases*, 18 J. OF THE AM. ACAD. OF MATRIMONIAL LAWS. 295, 295 (2002).
[23] *Id.* (emphasis added).

use "the best approach that is going to aid in obtaining the information sought and necessary in ascertaining the child's preference and at the same time ensuring that the child's best interest is put first."[24] Here, there was prioritization of form over substance, in that Judge Eighmy appointed a Guardian *Ad Litem*, but there was no meaningful voice for the children through the GAL. The contact between them was essentially limited to the GAL telling the children, prior to the hearing, that they had to do what the judge said. App. 14, R. Doc. 1, at 8.

#### c. *Harms of Denying the Child's Right to be Heard*

Lack of expression is the aspect of divorce that results in the greatest amount of psychological problems and frustration in children after the proceeding has concluded.[25] In one study, many parents did not want to discuss their decision to divorce for fear of how the children would react; 5 years later, 23 percent of the affected children remained angry.[26] Exclusion from participation often increases children's feelings of isolation and frustration.[27]

---

[24] *Id.* at 308–09.
[25] Rebecca Hinton, Comment, *Giving Children a Right to be Heard: Suggested Reforms to Provide Louisiana Children a Voice in Child Custody Disputes*, 65 LA. L. REV. 1539, 1540 (2005).
[26] *Id.* at 1546.
[27] *Id.*; *see also* Linda D. Elrod, *Counsel for the Child in Custody Disputes: The Time is Now*, 26 FAM. L.Q. 53, 53–54 (1992) (noting trend of states toward requiring independent counsel for children whenever custody is contested; among the factors at play are a shift from thinking of a child as chattel, to that of the child as a person with a right to be heard, and growing dissatisfaction with the failure of the adversary system to protect children embroiled in their parents' disputes).

Courts can mitigate the potential risks to children in a child custody dispute by allowing them to express their views and offer input, so that the child does not feel lost and unimportant throughout the process.[28] This is critical, as statistics suggest that judges who fail to elicit, or who ignore, a child's custodial preferences are increasingly likely to have their custody orders reversed on appeal.[29] Recently-articulated principles for family justice reform provide: "To the extent possible, court processes should be designed to minimize re-traumatization and to facilitate effective participation by parties, including children, who have experienced trauma."[30] In sharp contrast here, Judge Eighmy's actions resulted in further traumatic consequences, including detention in cold, isolated cells and a strip search, that the children will likely remember for the rest of their lives.

### B. Judge Eighmy's Actions Were Contrary to the Baseline Expectations of Family Law Judging

Unlike the approach taken in this case, the court process should minimize trauma to the extent possible, not increase it.[31] Judges handling family matters should be trained in understanding the effects of trauma as well as reasonable

---

[28] Hinton, *supra* note 25, at 1546.

[29] Howard A. Davidson, *The Child's Right to be Heard and Represented in Judicial Proceedings*, 18 PEPP. L. REV. 255, 270 (1991).

[30] *Family Justice Initiative: Principles for Family Justice Reform*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. 5 (2019), https://iaals.du.edu/sites/default/files/documents/publications/family_justice_initiative_principles.pdf.

[31] *Id.*

measures that can be taken to promote a sensitized, trauma-responsive process and environment.[32] Ideally, family court judges should have familiarity with social work, psychology, and dispute resolution.[33]

Divorce, separation, and parental responsibility cases "focus on some of the most intimate, emotional, and all-encompassing aspects of parties' personal lives," and the "volume and scope of family law cases exacerbate the difficulty of their resolution."[34] The role of family court judges can present unique ethical issues on and off the bench: "The scope of the ethical landscape is arguably more vast for a juvenile and family court judge than any other judicial officer adjudicating any other type of case."[35]

### 1. ***Facilitation Is A Well-Founded Goal of Family Court***

The proper role of a family judge is to facilitate consensual resolutions to the degree possible, while always safeguarding the rights, safety and well-being of

---

[32] *Id.*
[33] *Id.* at 16.
[34] Natalie Anne Knowlton, *The Modern Family Court Judge: Knowledge, Qualities & Skills for Success*, INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS. 5 (2014) (quoting Barbara A. Babb, *Guest Editorial Notes*, 40 FAM. CT. REV. 413, 413 (2002)), https://www.afccnet.org/Portals/0/PDF/the_modern_family_court_judge.pdf?ver=q4udjLCww9UGILyXlPiNWg%3d%3d.
[35] *Id.* (quoting Janice M. Rosa, *Book Review: Leonard Edwards'* The Role of The Juvenile Court Judge: Practice and Ethics, 52 FAM. CT. REV. 704, 704 (2014) (reviewing LEONARD EDWARDS, CAL. JUDGES ASS'N, THE ROLE OF THE JUVENILE COURT JUDGE: PRACTICE AND ETHICS (2012))).

children. Though a judge's good faith determination may or may not be the preferred course of all involved, if delivered without intimidation or partisanship the legitimacy of the process is preserved.[36]

Where, however, the judicial officer takes on a partisan role, acting through force rather than conciliation, confidence in the institution is undermined. The adversarial process is ill-suited for custody disputes and family reorganization.[37] It often causes the child to lose his or her position as the primary concern.[38] The message sent by the legal system will have a life-long impact on participants.[39] As such, the court's responsibility is to manage the case toward a just and timely resolution.[40]

"Family cases involve sensitive issues and litigant emotions can run high. In these situations, it is especially important that judges appreciate the vulnerable state in which litigants appear before the court."[41] According to *Cornerstones of State Judicial Selection*[42] ("Cornerstones"), judges should exhibit a temperament

---

[36] *Family Justice Initiative*, *supra* note 30, at 4-5.
[37] *Id.* at 2.
[38] Hinton, *supra* note 25, at 1547.
[39] *Id.*
[40] *Family Justice Initiative*, *supra* note 30, at 3.
[41] Knowlton, *supra* note 34, at 9.
[42] IAALS, CORNERSTONES OF STATE JUDICIAL SELECTION: LAYING THE FOUNDATION FOR QUALITY COURT SYSTEMS AND JUDGES (2012), available at http://iaals.du.edu/initiatives/quality-judges-initiative/recommendedmodels/cornerstones-of-state-judicial-selection (created by IAALS Quality Judges Initiative) [hereinafter CORNERSTONES].

that is "at all times respectful of counsel, parties, witnesses, and others present in the courtroom."[43] Cornerstones "acknowledges that '[f]or many people, appearing in court raises feelings of nervousness and apprehension,' which is especially true in family cases where many litigants are already emotionally vulnerable"; and "Tom Tyler notes that '[r]espect matters at all stages . . . . It includes both treating people well, that is, with courtesy and politeness, and showing respect for people's rights.'"[44]

### 2. *Impact of Perception of Judicial Unfairness*

Research and scholarship on procedural justice confirm that having a voice is an important indicator of how litigants perceive the fairness of the court process. Procedural fairness pioneers Tom Tyler, Judge Kevin Burke, and Judge Steve Leben, among others, have acknowledged that "[h]aving an opportunity to voice their perspective has a positive effect upon people's experience with the legal system irrespective of their outcome." [45] "This effect is only achieved, however, if

---

[43] Knowlton, *supra* note 34, at 10.
[44] *Id.* (footnote omitted) (quoting CORNERSTONES, *supra* note 42, at 4; Tom R. Tyler, *Procedural Justice and the Courts*, 44 CT. REV. 26, 30 (2007)).
[45] *Id.* at 8 (quoting Tyler, *supra* note 44, at 30) (citing Kevin Burke & Steve Leben, *Procedural Fairness: A Key Ingredient in Public Satisfaction*, 44 CT. REV. 4, 12–13 (2007)).

litigants 'feel that the authority sincerely considered their arguments before making their decision.'"[46]

While the present facts fall outside of the delinquency context, research in that field is instructive to this Court's assessment of this case because the children—who had committed no crime, nor were charged with having done so—were twice jailed. They were given no opportunity to voice their opinions, and then punished for attempting to do so. For youth involved in the criminal legal system, the perceived severity of court sanctions is a risk marker for continued offending behavior[47] associated with a reduction in gainful activity.[48] "[R]esearch consistently finds that when offenders view the justice system's reaction to their offense as fair, they are less likely to reoffend and more likely to comply with the conditions of their sanction."[49] Indeed, one study suggested that anger and defiance related to procedural and substantive unfairness throughout the various stages of

---

[46] *Id.* at 8–9 (quoting Tyler, *supra* note 44, at 30.)
[47] Carol A. Schubert et al., *Influence of Mental Health and Substance Use Problems and Criminogenic Risk on Outcomes in Serious Juvenile Offenders*, 50 J. OF THE AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY 925, 928 (2011).
[48] *Id.* at 933.
[49] Meghan R. Ogle & Jillian J. Turanovic, *Is Getting Tough with Low-Risk Kids a Good Idea? The Effect of Failure to Appear Detention Stays on Juvenile Recidivism*, CRIM. JUST. POL'Y REV. at 21 (2016).

the legal process may be associated with disproportionate rates of recidivism observed in populations of previously incarcerated young offenders.[50]

"[B]eing detained may alter youth's perception of procedural legitimacy and respect for legal authority. These changes in perceived legitimacy will affect the youth's subsequent behavior."[51] Like the children in this case, "youth who are issued FTA [failure to appear] pick-up orders are generally not considered a threat to public safety. . . . This calls the value of detaining such low-risk offenders into question, especially as the potentially harmful nature of exposing youth to confinement has been well documented . . . ."[52] Judge Eighmy's decision to detain the children here on multiple occasions despite their status as non-offending youth exceeds the bounds of legitimacy and likely imprinted a lack of trust in the judicial system.

### C. **The Record Reflects an Inappropriate Threat of Referral to Foster Care and Two Instances of Deleterious Incarceration**

The experiences of B.R. and K.R. trigger discussion of the impact of youthful incarceration on long-term behavior. Moreover, the threat of referral to

---

[50] Peter J. Ashkar & Dianna T. Kenny, *Views from the Inside: Young Offenders' Subjective Experiences of Incarceration*, 52 INT'L J. OF OFFENDER THERAPY & COMPAR. CRIMINOLOGY 584, 587 (2008) (citing Donna M. Bishop, Charles E. Frazier, Lonn Lanza-Kaduce & Lawrence Winner, *The Transfer of Juveniles to Criminal Court: Does it Make a Difference?*, 42 CRIME & DELINQ. 171 (1996)).
[51] Ogle & Turanovic, *supra* note 49, at 19.
[52] *Id.* at 4.

the foster system for disagreeing with the judge's choice and wishing to be heard is very serious. It is questionable in the first instance whether such a remedy is available in a custody dispute, or family court generally, absent allegations of neglect or abuse reviewed under a suitably strenuous standard. And while a judicial officer may properly consider referral to the Missouri Children's Division for investigation, mere disagreement from children about their custodial status is not a reason to do so.[53]

#### 1. *Potential Negative Impacts of Juvenile Detention and Incarceration*

Incarceration should be used as a last, not first, resort. Even brief stays in detention should be met with deep skepticism,[54] since short-term incarceration can have long-term consequences.[55] "The negative consequences of detention are not only felt by youth who serve lengthy sentences behind bars, they are also felt by youth who experience pretrial detention" (usually lasting up to 72 hours).[56] In one study, youth incarcerated for less than a month during adolescence were more likely than youth not involved in the criminal justice system to have depressive

[53] *See, e.g.*, MO. REV. STAT. § 630.163 (requiring reporting where reporter perceives "a likelihood of suffering serious phsycial harm or . . . abuse or neglect").
[54] Ogle & Turanovic, *supra* note 49, at 4.
[55] *Id.* at 19.
[56] *Id.* at 3-4.

symptoms as an adult.[57] Juvenile detention increases crime; for each day held, there is a 1 percent increased likelihood of recidivism.[58]

Research indicates that children incarcerated at younger ages are more likely to report worse general health and more depressive symptoms.[59] "The psychological impact of juvenile incarceration on youth mental health is immense."[60] Young offenders report being scared, humiliated and depersonalized upon reaching prison; most saw prison as a dislocating experience, unconnected to their lives outside.[61] "[R]esearch indicates that even a short turn in detention …. can … mean profound and potentially lifelong negative consequences for the

---

[57] *A Right to Liberty: Resources for Challenging the Detention of Children*, NAT'L JUVENILE DEF. CLINIC (August 2019), https://njdc.info/wp-content/uploads/2019/A-Right-to-Liberty-Resources-for-Challenging-the-Detention-of-Children-1.pdf (citing Elizabeth S. Barnert et al., *Does Incarcerating Young People Affect Their Adult Health Outcomes?*, 139 PEDIATRICS 1, 2 (2017)); *see also* Barry Holman & Jason Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities*, JUST. POL'Y INST., https://justicepolicy.org/wp-content/uploads/2022/02/06-11_rep_dangersofdetention_jj.pdf (last visited Mar. 28, 2022) (detention for a short period separates youth physically and emotionally from the families and communities most invested in their success).

[58] Josh Rovner, *Too Many Locked Doors: The Scope of Youth Confinement Is Vastly Understated*, THE SENT'G PROJECT 8 (2022), https://www.sentencingproject.org/ publications/too-many-locked-doors/.

[59] Elizabeth S. Barnert et al., *supra* note 57, at 6.

[60] Justine Kaneda, *The Impact of Juvenile Incarceration on Youth Mental Health: A Systemic Failure of Mass Incarceration in the United States*, STAN. MED. 1, https://med.stanford.edu/schoolhealtheval/socialPrograms.html (last visited Apr. 11, 2022).

[61] Ashkar & Kenny, *supra* note 50, at 586 (referencing study done by J. Lyon, C. Dennison, and A. Wilson).

young people involved."[62] Because of the long-lasting deleterious effects of youth incarceration, incarceration of juveniles should only be considered after the child is given notice, the opportunity to be heard, access to legal counsel, a neutral factfinder, and adequate testing of evidence. And, if incarceration is considered for juveniles, it should never be in an adult facility.[63] The foregoing rights were not extended to the children in this case prior to their confinement in an adult jail.

### 2. *Potential Negative Impacts of Foster Care*

In 2021, over 630,000 children were served by the foster care system.[64] Fewer due process rights are afforded in child welfare court proceedings than in the juvenile criminal legal system.[65] The role of courts in the context of foster care is critical.

> Courts play an integral role in the child welfare system, where the decisions made are serious and consequential: Is the youth in danger of immediate harm? Should the child be removed from the home?....How will the parent and child and siblings be reunified? Is there a relative who will care for or adopt the child?.... Does the youth have the supports needed to transition out of foster care?[66]

---

[62] *Kids Deserve Better: Why Juvenile Detention Reform Matters*, ANNIE E. CASEY FOUND. (2018), https://www.aecf.org/blog/kids-deserve-better-why-juvenile-detention-reform-matters.

[63] *See generally* MO. REV. STAT § 211.061.

[64] Kim Dvorchak, *Closing the Justice Gap for Youth in the Foster Care to Prison Pipeline*, CIVIC RSCH. INST.: JUVENILE JUST. UPDATE (2022), at 3 (footnote omitted).

[65] *Id.*

[66] *Id.* at 4.

"If incarceration is a threat to a child's liberty interests, then the possibility of a state removing a child from their home and family unit is also a threat to a child's liberty interests."[67] And yet, while children in delinquency proceedings have a constitutional right to counsel, as established 55 years ago in *Gault*,[68] no such constitutional right is afforded youth in foster care. While Missouri law requires the appointment of a Guardian *Ad Litem* to represent the child's best interest in certain circumstances, such as where there is neglect, in child custody or dissolution cases a Guardian *Ad Litem* is merely permissible.[69] In this case, though the court did appoint a Guardian *Ad Litem*, such an appointment did not further the children's due process rights and ability to be meaningfully heard.

Judge Eighmy's conduct in threatening referral to foster care was contrary to widely-accepted interests in family integrity and "the moral, emotional, mental, and physical welfare of the minor and the best interests of the community."[70] The

---

[67] Katherine Merger Kelsey, *A Child's Right to Counsel: The Case for Indiana to Craft Its Own Framework*, 9 IND. J.L. & SOC. EQUALITY 167 (2021).
[68] *In re Gault*, 387 U.S. 1, 41 (1967).
[69] *See* MO. REV. STAT. § 211.211; *id.* § 452.423.
[70] Trivedi, *supra* note 5, at 278-79 (quoting *Stanley v. Illinois*, 405 U.S. 645, 652 (1972)); *see J.B. v. Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997) (quoting *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994) ("forced separation of parent from child, even for a short time, represents a serious impingement" upon both the parents' and child's rights)); *see also Jackson*, 15 F.3d at 346 (state's removal of a child from parents for several days without judicial review "implicates the child's interests in his family's integrity . . .").

U.S. Supreme Court recognizes family integrity as a fundamental liberty right, in which judges may not interfere without due process of law.[71]

### 3. *The Crossover Phenomenon*

The term "crossover youth" refers to youth involved in both the child welfare and juvenile justice systems. For youth in foster care, group home placement increases the likelihood of being charged with crimes, and institutionalization increases the likelihood of arrest and juvenile justice involvement.[72] One-third of youth in the child welfare system will later be subject to the juvenile legal system and are more likely to be subject to the adult criminal legal system.[73] Studies of youth in the juvenile legal system show a high percentage of child welfare histories—nearly 50-75 percent in some jurisdictions.[74]

Part of the framework to prevent crossover is "avoid[ing] punitive actions that focus solely on acting-out behaviors, and help[ing] youth understand the thoughts and emotions causing the behavior," as well as "employ[ing] youth

---

[71] Josh Gupta-Kagan, *Due Process of Law and Child Protection*, *in* CHILD WELFARE LAW AND PRACTICE: REPRESENTING CHILDREN, PARENTS, AND STATE AGENCIES IN ABUSE, NEGLECT, AND DEPENDENCY CASES 387, 389 (Donald N. Duquette et al. eds., 3 ed. 2016).
[72] *Every Kid Needs a Family: Crossover Youth and Institutional Care*, NCSC, https://www.ncsc.org/everykid/_media/microsites/files/every-kid/EKNF_Crossover-Youth-and-Congregate-Care_Final_9.4.20-logo.pdf (last visited Mar. 28, 2022).
[73] Dvorchak, *supra* note 64, at 3.
[74] *Id.*

empowerment strategies that give young people more control and voice over their living arrangement and education setting."[75] Judge Eighmy's threat of foster care for the children here was not innocuous—it portended long-lasting, potential implications that create concern of a family court to prison pipeline for crossover youth.

### D. <u>**The Treatment of B.R. and K.R. Here Triggers Concern About the Disproportionate and Disparate Treatment of Other Youth**</u>

The implications of Appellant's actions in this case, if countenanced as a routine act of judicial authority, raise concerns for children of all backgrounds involved in the court system. In recent decades, implicit bias has become better understood, as have its implications, both on how litigants experience the judicial process and on how judges experience litigants. "Shaped and influenced by one's personal experiences, cultural stereotypes, and attitudes about oneself, implicit biases can jeopardize fairness in any type of case. Recognizing that these biases can exist and understanding strategies for addressing them are important for family court judges who encounter an incredibly diverse range of litigants."[76] In recent years, the National Center for State Courts (NCSC) has undertaken significant

---

[75] *Id.* at 16.
[76] Knowlton, *supra* note 34, at 7.

work in the area of implicit bias, including the development of educational resources for courts.[77]

### 1. *Racial Disparity: The Equity Perspective*

> State determinations of what is best often reflect simplistic understandings of the benefits of a nuclear family with financial stability rather than the complex needs of children from unstable homes.[78]

During the period of COVID-19, children of color have disproportionally been held in custody due to their home status; *e.g.*, an elderly grandparent or single working parent unable to supervise the youth while the schools were closed.[79]

While incarceration is troublesome for all youths,[80] children of color are disproportionately exposed to its harms. Black youth are more than four times as likely to be held in juvenile facilities as their white peers.[81] "Detention is also unfair and costly. African-American, Hispanic, and American Indian youth are far

[77] *Id*. at n.32 (citing PAMELA M. CASEY ET AL., NAT'L CTR. FOR STATE CTS., HELPING COURTS ADDRESS IMPLICIT BIAS: RESOURCES FOR EDUCATION (2012)).
[78] Laufer-Ukeles, *supra* note 15, at 762.
[79] Eli Hager, *Many Juvenile Jails Are Now Almost Entirely Filled with Young People of Color*, THE MARSHALL PROJECT (Mar. 8, 2021, 6:00 AM), https://www.themarshallproject.org/2021/03/08/many-juvenile-jails-are-now-almost-entirely-filled-with-young-people-of-color.
[80] Elizabeth S. Barnert et al., *supra* note 57, at 6.
[81] Josh Rovner, *Black Disparities in Youth Incarceration*, THE SENT'G PROJECT (2021), https://www.sentencingproject.org/publications/black-disparities-youth-incarceration/.

more likely than their white counterparts to be detained, even after controlling for the seriousness of an offense, offending history and other factors."[82]

The detentions of B.R. and K.R., if implicitly endorsed by this Court, carry even more troubling implications when considered against the backdrop of the many disparate youth involved in custody disputes, or who enter the juvenile justice system. Not only are these children more likely to suffer adverse consequences due to a judge's actions, they may also lack the ability of B.R. and K.R. to challenge such actions through the judicial system.

## CONCLUSION

The actions under review here evoke concern across a range of legal and societal issues, and should not be normalized by reversing the decision below on the grounds that they involve a mere exercise of discretion by a jurist acting in a judicial capacity. NACC joins Mr. Rockett in requesting affirmance of the decision below.

---

[82] *Kids Deserve Better: Why Juvenile Detention Reform Matters*, *supra* note 62.

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

/s/ J. Bennett Clark

J. Bennett Clark
Emma G. McEnery
Ellen M. Komlos
211 N. Broadway, Suite 3600
Saint Louis, Missouri 63102
Telephone: (314) 259-2000

Kristin Howard Corradini
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
Telephone: (312) 602-5000

*Counsel for Amicus Curiae National Association of Counsel for Children*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that, pursuant to Federal Rule of Civil Procedure 32, this brief complies with the type-volume, typeface, and type style limitations because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. NACC has respectfully requested leave of this Court to file this brief in excess of the 6,500 word limit provided by Federal Rule of Civil Procedure 29(a)(5). This brief contains 7059 words, excluding the sections listed in Fed. R. App. P. 32(f), as counted by Microsoft Word, which is the maximum higher level of words, or in the alternative 6743 number of words should the parts of the brief required as Amicus by Federal Rule of Appellate Procedure 29(a) be exempted. The electronic copy of this brief has been scanned for viruses, and found to be free therefrom.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing has been served electronically to counsel of record via operation of the Court's CM/ECF system this 18th day of April, 2022.

*/s/ J. Bennett Clark*